No. 03-685

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 130

RUSSELL PANNONI,

      Petitioner and Appellant,

  v.

BOARD OF TRUSTEES, BROWNING SCHOOL
DISTRICT NO. 9, STEVE SMYTH, and KEN WERNER,

      Respondents,  Respondents and Cross-Appellants.

APPEAL FROM:    District Court of the Ninth Judicial District,
                In and For the County of Glacier, Cause No. DV 2002-038,
                Honorable Marc G. Buyske, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Michael Dahlem, Attorney at Law, Missoula, Montana

      For Respondents:

          Catherine M. Swift, Gough, Shanahan, Johnson & Waterman,
          Helena, Montana

          Darcee Moe, Department of Labor and Industry, Helena, Montana
          Attorney General, Helena, Montana

                    Submitted on Briefs:  February 25, 2004

                            Decided:  May 18, 2004

Filed:

                            Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Russell Pannoni (Pannoni) appeals the decision of the District Court upholding a Montana Human Rights Commission (the Commission) decision affirming a decision reached at a Department of Labor and Industry (the Agency) hearing regarding Pannoni's employment termination. The Board of Trustees, Browning School District No. 9 (acting through its Board of Trustees, collectively called the School), Superintendent Steve Smyth (Smyth), and District Personnel Director Ken Werner (Werner) cross-appeal the court's denial of costs. We affirm.

¶2 The issues on appeal are as follows:

¶3 1. Whether the District Court erred in affirming the Agency's conclusion that Pannoni was not a qualified individual with a disability ?

¶4 2. Whether the District Court erred in affirming the exclusion of medical evidence at the Agency hearing?

¶5 3. Whether the District Court erred in affirming the Agency's decision regarding the School's post-termination actions?

¶6 4. Whether the District Court erred in denying Pannoni's request to present additional evidence?

¶7 5. Whether the District Court erred when it did not award costs to the School, Smyth, and Werner?

Factual and Procedural Background

¶8      Pannoni worked as a teacher in Browning School District No. 9 for a total of sixteen years.  The School is a public school district which operates a high school, a middle school, three elementary schools, and two rural schools.  The School is located in a sparsely-populated, isolated region, near the Canadian border on the Blackfeet Indian Reservation, with few medical and shopping services.  Its students are considered "at risk," meaning the School has lower achievement and proficiency levels and higher drop-out rates than are normal or acceptable.  The at-risk student population makes teaching more difficult and historically the School loses some teachers during each school year to voluntary termination.

¶9      Most School teaching positions are full-time with the teachers required to work a total of 187 days per year.  The School hires teachers to work where assigned with no permanent assignments to individual schools.  The School has a difficult time finding certified teachers to fill part-time positions or to serve as substitutes.  As a result, the School often has to utilize uncertified substitutes to fill vacancies.  Because of the difficulty the School has recruiting qualified teachers, it ordinarily seeks to recruit new teachers and fill openings either before the openings actually exist or during the previous school year.  The difficulty recruiting teachers is magnified when the School is forced to fill unanticipated vacancies that occur during the school year.

¶10     The School emphasizes that attendance is an essential function of a teacher's job. The School views teacher attendance as critical, especially during the first few and last few months of a school year.  Pursuant to a collective bargaining agreement between the teachers

3

and the School, each teacher is allowed fourteen days of sick leave per school year out of which each teacher may elect to take up to ten days of personal leave without justification. The School prefers that its teachers not utilize all their personal leave days each year because of the importance of continuity in instruction for the at-risk student population and because of the difficulty finding qualified substitute teachers.

¶11 Pannoni worked for the School as a teacher for many years. Relevant to this case, he worked at Babb Elementary School from 1989 through 1994. In 1994, the School transferred Pannoni to the K.W. Bergen Elementary School in Browning, Montana. Pannoni filed a grievance to fight this transfer because he wished to continue teaching in Babb. In the 1995-1996 school year, Pannoni taught at both Babb and K.W. Bergen. In 1996, Pannoni taught in Babb. During the 1997-1998 school year, Pannoni taught at Babb. Pannoni was transferred to teach at the Browning Middle School (Middle School) for the 1998-1999 school year. Pannoni did not want to leave his position in Babb and especially did not want to teach at the Middle School. The Middle School was overcrowded, the students were much more difficult to work with than the elementary students at Babb, and the environment at the school was stressful for Pannoni.

¶12 In September of 1998, Pannoni requested a Family and Medical Leave Act (FMLA) leave based on a medical disability. Pannoni's treating physican, family practitioner Dr. K.J. Taylor, subsequently notified the School by letter that Pannoni had suffered from intermittent depression for years and the transfer to the Middle School worsened his depression so that

4

he was "almost totally dysfunctional." Dr. Taylor recommended the School transfer Pannoni back to the Babb School or he expected Pannoni would become totally disabled.

¶13    In October of 1998, the School sent a federal Department of Labor form (a Certification of Health Care Provider form) for Dr. Taylor to complete. The School also wanted a second medical opinion. Dr. Michael Newman, a psychiatrist, provided the second medical opinion. After seeing Pannoni in October of 1998, Dr. Newman concluded that, at that time, Pannoni did not suffer from a serious medical condition that rendered him unable to perform his job duties. Although Pannoni was upset and depressed about his transfer to the Middle School, he was also ready to return to work if he could work at the Babb School. Dr. Newman's conclusion was that Pannoni was not suffering from debilitating depression but that he was instead angry with the School for transferring him. Dr. Newman reported Pannoni had taken prescription antidepressants and/or anti-anxiety medication for only two or three days on two occasions and he had not received counseling.

¶14    In October of 1998, Dr. Taylor sent another letter to the School stating that Pannoni's condition was unimproved and suggested that he not work for another month. At this time, a certified substitute teacher was hired to work in Pannoni's place until after Thanksgiving break. In the first week of November, Pannoni notified the School that Dr. Taylor had released him to return to work within a week. Pannoni asked that he be considered for jobs other than that at the Middle School. The School notified Pannoni of the discrepancy regarding Dr. Taylor's letter which stated Pannoni needed another month off and Pannoni's statement that he was ready to return to work within a week. At this time, the School

requested a third medical opinion and again requested Dr. Taylor complete the FMLA medical certification form. Pannoni did not have Dr. Taylor complete this form and also did not obtain a third medical opinion.

¶15    In the years that followed, Pannoni worked sporadically. He was frequently absent. In eight of Pannoni's last eleven years of employment, he was absent more than his contracted fourteen days of personal and sick leave. In the 1997-1998 school year, Pannoni was absent twenty-three days. He was absent more than eighty-seven days during the 1998-1999 school year. During the 1999-2000 school year, he was absent more than 137 out of 178 work days.

¶16    In January of 2000, Pannoni met with Werner and a principal to discuss accommodations which would allow Pannoni to return to work. On numerous occasions, Pannoni notified the School that he was supposed to be well enough to resume his teaching position. However, Pannoni was still often unable to come to work despite medical releases and was unsuccessful at completing the required attendance for a teaching position, either at the Babb School or at the Middle School.

¶17    The School adjusted Pannoni's work schedule and student load, attempting to accommodate Pannoni's needs while still providing the necessary continuity and quality of teaching services that the students required and the School demanded. In December of 1999, the School retained Dr. Nathan Munn, an experienced psychiatrist, to evaluate Pannoni. After meeting with both Pannoni and Pannoni's wife, Dr. Munn concluded that Pannoni suffered from a serious health condition, that as of January 2000 Pannoni was incapacitated

6

and unable to work because of his depression, that Pannoni required treatment for his depression, and that a transfer back to Babb would not suffice.

¶18  In May of 2000, Smyth recommended that the School terminate Pannoni's employment because of his excessive absences. Until February of 2000, the School continued to provide Pannoni with health insurance benefits. After the School held a hearing, Pannoni was terminated as a teacher on May 23, 2000. On June 6, 2000, Pannoni filed a complaint with the Agency alleging that the School, Smyth, and Werner discriminated against him because of his depression (his disability) "by taking adverse employment action against him because of his disability and retaliating against him." An Agency hearing was held in April of 2001.

¶19  The Agency concluded that Pannoni's depression rendered him unable to regularly attend school every day to teach. Pannoni had a history of prolonged, erratic, and numerous absences that was impossible for the School to accommodate. His absences extended well beyond the return-to-work dates that his health care professionals provided. As a result of his "genuine inability to keep showing up every school day[,]" he was rendered an unqualified individual and thus the School had no duty to provide him reasonable accommodation. The Agency determined that the School reasonably concluded that it could not rely upon yet another assurance from Pannoni's health care providers that he would be able to return to a full teaching load if his leave was extended again. The School also was found to have acted reasonably when it concluded that it could not, without undue hardship

7

to the School's students, continue to provide interim coverage for Pannoni's classes with no assurance that he would return to work and maintain his attendance in the fall of 2000.

¶20 The Agency concluded that Pannoni did suffer from a disability but was not otherwise a qualified person. The School had legitimate business reasons (the need for teacher attendance) for its adverse employment actions and did not illegally discriminate against Pannoni by denying his requests for leaves of absence, refusing the specific accommodations he proposed (including hiring a new teacher and then releasing the teacher if Pannoni could return to work), and eventually terminating Pannoni's employment. The Agency determined the School acted reasonably when it terminated Pannoni's employment and hired a new teacher for the next year.

¶21 The School, Smyth, and Werner requested an award of costs. The Agency denied the request because it did not believe the general legislative mandate to follow the Montana Rules of Civil Procedure in Agency proceedings empowered the Agency to award costs in contested case hearings, such as employment discrimination case hearings.

¶22 Pannoni appealed the Agency's decision to the Commission. The Commission affirmed the Agency's decision. Pannoni then appealed the Commission's decision to the District Court. The District Court affirmed the Commission's decision. On appeal to the District Court, Pannoni asked the court to allow him to present additional evidence to the Human Rights Bureau, the Agency, and the Commission. This evidence consisted of a July 2002 letter from the School's counsel and the results of a psychological consultation which

8

took place more than one year after the initial Agency hearing. The District Court denied this request. Pannoni appeals the District Court rulings.

¶23 After the court affirmed the Commission decision, the School, Smyth, and Werner filed a request for costs in the District Court. The court denied the request. The School, Smyth, and Werner have cross-appealed the denial of costs.

## Discussion

¶24 Issue 1: Whether the District Court erred in affirming the Agency's conclusion that Pannoni was not a qualified individual with a disability?

¶25 We review a district court's order affirming or reversing an administrative decision in a contested case to determine whether the findings of fact are clearly erroneous and whether the agency correctly interpreted the law. *Laudert v. Richland County Sheriff's Dept.*, 2000 MT 218, ¶ 14, 301 Mont. 114, ¶ 14, 7 P.3d 386, ¶ 14.

¶26 The Montana Human Rights Act (MHRA), modeled in part after the Americans with Disabilities Act (ADA), prohibits discrimination based on physical or mental disability by employers against employees. Section 49-2-303(1)(a), MCA. A disability is defined as a physical or mental impairment that substantially limits one or more of a person's major life activities. Section 49-2-101(19)(a), MCA. A mental impairment can be a mental or psychological disorder, including an emotional or mental illness such as major depression. *Martinell v. Montana Power Co.* (1994), 268 Mont. 292, 302-03, 886 P.2d 421, 428. Work is considered one of life's major activities. *Martinell*, 268 Mont. at 304, 886 P.2d at 428.

9

¶27    If a person suffers from a disability, the employer has a duty to provide a reasonable accommodation if, with such accommodation, the person could perform the essential job functions of the position. Section 49-2-101(19)(b), MCA; Rule 24.9.606(2), ARM. A person with a disability is qualified to hold an employment position if he or she can perform the essential job function with or without reasonable accommodation. Rule 24.9.606(2), ARM. If a person is unable to perform the essential job functions, even with a reasonable accommodation, he or she is not a qualified person. The claimant carries the burden of proving that he or she can perform the essential job functions for a position in order to establish he or she is a qualified person. *Heiat v. Eastern Montana College* (1996), 275 Mont. 322, 328-29, 912 P.2d 787, 791-92; *Nowak v. St. Rita High School* (7th Cir. 1998), 142 F.3d 999, 1003.

¶28    Because the MHRA is closely modeled after federal anti-discrimination statutes such as the ADA, this Court consistently considers federal court interpretations when we interpret the provisions of the MHRA. *Laudert*, ¶ 49. "The determination as to whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision." *Nowak*, 142 F.3d at 1003 (citation omitted). If a reasonable accommodation available to an employer could plausibly enable a handicapped employee to adequately perform his or her job, an employer is liable for failing to attempt that accommodation. *Kimbro v. Atlantic Richfield Co.* (9th Cir. 1989), 889 F.2d 869, 879.

¶29    An employer is not required "to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence." *Nowak*, 142 F.3d at 1004. The

10

requirement to grant a leave of absence where "there are plausible reasons to believe that it would accommodate the employee's disability can not be repeatedly invoked, thus permitting an unqualified employee to avoid termination by requesting a leave of absence each time he is about to be fired." *Humphrey v. Memorial Hospitals Assn.* (9th Cir. 2001), 239 F.3d 1128, 1136 n.13. While granting a leave of absence in the first instance may be required, an employer is not obligated to grant a second leave if the employee's condition recurred after return from the initial leave. *Kimbro*, 889 F.2d at 879 n.10. "Indeed, the fact that an accommodation has been attempted and was unsuccessful is a relevant consideration for the factfinder and may in fact prove dispositive in determining whether failure to permit subsequent leave constituted failure to make a reasonable accommodation." *Kimbro*, 889 F.2d at 879.

¶30     The overwhelming majority of courts have held that an employee who does not come to work cannot perform any of his or her job functions, essential or otherwise, except in the unusual case where an employee can effectively perform all work-related duties at home (such as a medical transcriptionist). *Nowak*, 142 F.3d at 1004; *Tyndall v. Natl. Educ. Ctrs., Inc.* (4th Cir. 1994), 31 F.3d 209, 213; *Wimbley v. Bolger* (6th Cir. 1987), 831 F.2d 298; *Nesser v. Trans World Airlines, Inc.* (8th Cir. 1998), 160 F.3d 442, 445-46; *Carr v. Reno* (D.C. Cir. 1994), 23 F.3d 525, 529-30. Teaching is not one of the unusual cases where the employee can effectively perform all work-related duties at home.

¶31     Pannoni argues that the federal courts have adopted a very lenient standard for determining if an accommodation is reasonable. He claims that we should incorporate a

11

lenient "plausibility standard" into the reasonable accommodation analysis. Pannoni contends that his request for an extension of his unpaid leave of absence qualified as a reasonable accommodation pursuant to this standard because "it was at least plausible to believe on May 23, 2000 that he [Pannoni] would have been able to perform the essential functions of a teaching position at the beginning of the 2000-01 school year had his request been granted." He claims that the School was required to extend his leave unless the School could prove that the accommodation would have imposed an undue hardship.

¶32 Montana law clearly states that "[a] person with a physical or mental disability is qualified to hold an employment position if the person can perform the essential functions of the job with or without a reasonable accommodation for the person's physical or mental disability." Rule 24.9.606(2), ARM. This is substantively the same standard federal courts apply to employment discrimination claims based on an employee's disability. *Humphrey*, 239 F.3d at 1133; *Nowak*, 142 F.3d at 1002-03. Pannoni contends that, under a more lenient plausibility analysis, he has established that the requested leave of absence was a reasonable accommodation. We disagree. Pannoni has failed to establish a plausible reason to believe that another leave of absence would enable him to adequately perform his job, *Kimbro*, 889 F.2d at 879, or that it is plausible that such a leave would successfully accommodate his disability, *Humphrey*, 239 F.3d at 1136. We conclude the District Court, which relied on *Humphrey*, applied the correct standard in ascertaining whether Pannoni was a qualified individual deserving of reasonable accommodation.

12

¶33    Pannoni's depression is a disability which, if it substantially limits his ability to work, is covered by the provisions of the MHRA.  Section 49-2-101(19)(a), MCA; *Martinell*, 268 Mont. at 304, 886 P.2d at 429.  However, Pannoni is not a qualified individual unless he can prove that he can perform the essential job functions, with or without reasonable accommodation.  Section 49-2-303(19)(b), MCA; Rule 24.9.606(2), ARM.  Pannoni bears the burden of proving that, as of May 23, 2000, he was capable of performing the essential job functions of teaching, including regular attendance, in order to establish that he was a qualified individual.  *Nowak*, 142 F.3d at 1003; *Heiat*, 275 Mont. at 328-29, 912 P.2d at 791-92.  If he was unable to perform the essential job functions, even with a reasonable accommodation, he was not a qualified individual.  *Nowak*, 142 F.3d at 1003.

¶34    While the School may have been required to grant Pannoni an initial leave of absence (as it did), the School was not required to grant him subsequent leaves of absence after the initial accommodation was attempted and was unsuccessful.  *Kimbro*, 889 F.2d at 879.  The record is clear that upon returning after the initial leave of absence Pannoni was unable to regularly attend school.  He was thus not able to perform his essential job functions.  *Nowak*, 142 F.3d at 1003.  The School is not obligated to grant Pannoni indefinite leave or repeated leaves on the promise that Pannoni *may* be able to perform his job duties at some future date when history has proven that Pannoni is not able to perform these duties, despite his promises that a leave of absence would enable him to do so.  *Nowak*, 142 F.3d at 1004; *Kimbro*, 889 F.2d at 879.

¶35 Pannoni goes to great lengths attempting to persuade this Court that his requested accommodation of extended leave was a reasonable accommodation the School should have provided. However, Pannoni has not established that he is a qualified individual; that is, he has not demonstrated that with an extended leave he can perform the essential job functions. *Heiat*, 275 Mont. at 328-29, 912 P.2d at 791-92; *Nowak*, 142 F.3d at 1003. In the absence of such proof, Pannoni is not entitled to reasonable accommodation. Additionally, because he is not a qualified individual, we need not discuss whether the proposed accommodation would place an undue burden on the School. We affirm the determination that Pannoni is not a qualified individual.

¶36 Issue 2: Whether the District Court erred in affirming the exclusion of medical evidence at the Agency hearing?

¶37 In reviewing a district court's order affirming an administrative decision, we determine whether the findings of fact are clearly erroneous and whether the agency correctly interpreted the law. *Laudert*, ¶ 14. Pursuant to the Montana Administrative Procedures Act, § 2-4-612(5), MCA, "[a] party shall have the right to conduct cross-examinations required for a full and true disclosure of facts, including the right to cross-examine the author of any document prepared by or on behalf of or for the use of the agency and offered in evidence."

¶38 Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c),

14

M.R.Evid. Hearsay evidence is not admissible unless it falls within an exception to the hearsay rule. Rule 802, M.R.Evid. Rule 803(6), M.R.Evid., allows a hearsay exception for

> Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnosis, made at or near the time of the acts, events, conditions, opinions, or diagnosis, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. . . .

¶39     Pannoni sought to introduce four letters (one to Smyth, one to Werner, one to Pannoni and one generally addressed) prepared by his psychiatric social worker at the Cardston Mental Health Clinic (located in Canada). These letters were written medical reports in letter-form which contained observational information and opinions regarding Pannoni's medical condition and ability to return to work. The reports were accompanied by a written certification prepared by the custodian of medical records at the Carston Mental Health Center which stated that the reports had been prepared as part of regularly conducted business and "were made at or near the time of the acts, events, conditions, opinions, or diagnosis contained herein." No person testified regarding the content of the reports or about their status as regularly-kept records.

¶40     Pannoni claimed the reports came within the business records exception to the hearsay rule. Rule 803(6), M.R.Evid. The School objected to the introduction of the documents as hearsay. The hearing examiner sustained the objection on the basis that the reports were unsworn medical records containing expert opinion about Pannoni's medical condition. The

15

hearing examiner admitted the documents for the purpose of establishing notice to the School but excluded the reports for establishing the nature and severity of Pannoni's condition. Pannoni claims the reports should have been admitted for the truth of the matters asserted within the letters.

¶41 The District Court affirmed the hearing examiner's decision, noting that Pannoni attempted to lay the foundation for the evidence through a written certification prepared by the custodian of the records. The proffered foundation was a written document from the custodian who did not directly testify at the hearing; this foundational evidence was itself hearsay. Rule 801(c), M.R.Evid. Citing *Tongil Co. v. The Vessel "Hyundai Innovator"* (9th Cir. 1992), 968 F.2d 999, 1000, the court stated that hearsay does not establish the foundation for admission of otherwise inadmissible hearsay documents.

¶42 We agree with the District Court. A proper foundation was not laid for the admission of the records pursuant to Rule 803(6), M.R.Evid. Neither the custodian of the records nor another qualified witness testified regarding the reports, as required by Rule 803(6), M.R.Evid. Lacking the requisite foundation, the reports are inadmissible hearsay. Rule 803(6), M.R.Evid.

¶43 On appeal, Pannoni argues that the reports are subject to the authentication procedure for foreign public documents detailed in Rule 902(3), M.R.Evid., instead of the procedure of Rule 803(6), M.R.Evid. Pursuant to this rule, Pannoni claims it is not necessary for the records custodian to testify in person because the reports are admissible as self-authenticating documents. He contends the reports were properly authenticated as the business records of

16

a foreign public agency by the records custodian of the mental health clinic where the reports were created. Pannoni asserts the custodian's "certification was attested to by a notary public and certified by a representative of the Consulate General of the United States in accordance with Rule 902(3), M.R.Evid." He contends that this successfully establishes the reports as foreign public documents that need not be otherwise authenticated.

¶44 Pannoni's reliance on Rule 902(3), M.R.Evid., is misguided. Rule 902(3), M.R.Evid., provides for authentication of foreign public documents. These are documents

> executed or attested in an official capacity by a person authorized by the laws of a foreign country to make the execution or attestation, and accompanied by a final certification as to the genuineness of the signature and official position (A) of the executing or attesting person, or (B) of any foreign official whose certificate of genuineness of signature and official position relates to the execution of attestation or is in a chain of certificates of genuineness of signature and official position relating to the execution or attestation . . . .

Rule 902(3), M.R.Evid.

¶45 We have previously stated that hospital and ambulance records are ordinarily not documents that are self-authenticating and are not admissible business records pursuant to Rule 902, M.R.Evid. *Palmer by Diacon v. Farmers Ins. Exch.* (1988), 233 Mont. 515, 521, 761 P.2d 401, 405. Rule 902(3), M.R.Evid., modeled after Rule 902(3), F.R.Evid., applies to documents such as written laws or judicial records of a foreign country. Commission Comments to Rule 902, M.R.Evid. A specific example of the type of foreign public document encompassed by this rule is an inspection report from the Sudanese National Laboratory (a nationalized company and therefore a government entity) stating that a

17

shipment of peanuts was not contaminated when it left Sudan. *Raphaely Int'l v. Waterman Steamship Corp.* (2d Cir. 1992), 972 F.2d 498, 502.

¶46    Unsworn medical reports of a third person not called as a witness and available for cross-examination are hearsay and inadmissible in evidence. *Pickett v. Kyger* (1968), 151 Mont. 87, 98, 439 P.2d 57, 63; *Klaus v. Hillberry* (1971), 157 Mont. 277, 286, 485 P.2d 54, 59. If a party seeks to introduce expert testimony regarding the party's medical condition and prognosis, the expert must be available for cross-examination regarding his knowledge, training, and any assumptions or facts on which he or she has based his or her opinions. *Lynch v. Reed* (1997), 284 Mont. 321, 332, 944 P.2d 218, 225; *Goodnough v. State* (1982), 199 Mont. 9, 18, 647 P.2d 364, 369.

¶47    The reports Pannoni sought to introduce may be foreign documents because they are from the Cardston Mental Health Clinic located in Canada. However, they are not public documents of a foreign country as contemplated in Rule 902(3), M.R.Evid. Hospital records and medical reports are ordinarily not self-authenticating documents and are not admissible business records pursuant to Rule 902, M.R.Evid. *Palmer*, 233 Mont. at 521, 761 P.2d at 405. Pannoni's medical records are not foreign public documents, such as written laws or judicial records, which may properly be authenticated by the procedure in Rule 902(3), M.R.Evid. Commission Comments to Rule 902, M.R.Evid. The fact that Pannoni claims the reports were authenticated as business records of a foreign public agency by the records custodian, whose certification was later attested to by a notary public and certified by a

representative of the Consulate General of the United States, does not change the nature of the reports and the information they contained.

¶48 Additionally, the medical expert (the psychiatric social worker) who authored the reports was not called as a witness, did not give sworn testimony, and was not available for the requisite cross-examination regarding the information and opinions contained in the reports. Section 2-4-612(5), MCA; *Lynch,* 284 Mont. at 332, 944 P.2d at 225; *Goodnough*, 199 Mont. at 18, 647 P.2d at 369; *Pickett*, 151 Mont. at 98, 439 P.2d at 63; *Klaus*, 157 Mont. at 286, 485 P.2d at 59. The unsworn medical reports are not subject to any hearsay exception. Rule 802, M.R.Evid. Based on the foregoing, the reports are hearsay and inadmissible in evidence. *Pickett*, 151 Mont. at 98, 439 P.2d at 63; *Klaus*, 157 Mont. at 286, 485 P.2d at 59.

¶49 The District Court correctly upheld the Agency's decision to not allow the medical reports for the truth of the matters asserted within the records. The District Court correctly interpreted the law and its findings of fact are not clearly erroneous. *Laudert*, ¶ 14. We affirm the exclusion of this evidence.

¶50 Issue 3: Whether the District Court erred in affirming the Agency's decision regarding the School's post-termination actions?

¶51 We review a district court's order affirming an administrative decision to determine whether the findings of fact are clearly erroneous and whether the agency correctly interpreted the law. *Laudert*, ¶ 14. An administrative agency does not err in omitting a specific finding of fact or conclusion of law when the record as a whole supports the

19

conclusion reached by the agency. *See In the Matter of D.D.* (1996), 277 Mont. 164, 169, 920 P.2d 973, 976. In such a case, the agency's "error in failing to set forth a detailed statement of the facts may constitute harmless error." *In the Matter of D.D.*, 277 Mont. at 169, 920 P.2d at 976. "If the record provides a complete understanding of the issues without the aid of separate findings," a failure to make express findings does not require a remand. *EEOC v. Bruno's Restaurant* (9th Cir. 1992), 13 F.3d 285, 288.

¶52     The determination regarding whether a claimant is a qualified individual with a disability is made as of the time of the employment decision (i.e. termination). *Nowak*, 142 F.3d at 1003. If a former employee reapplies for employment and is discriminatorily refused employment, the employer has then committed a separate and distinct discriminatory act and unfair practice. *Collins v. United Air Lines, Inc.* (9th Cir. 1975), 514 F.2d 594, 596-97. However, an alleged illegal discharge from employment is not a continuing violation allowing the introduction of new evidence which comes into existence after the date of the initial discharge; the original discrimination charge matures on the date of the employment termination. *Nowak*, 142 F.3d at 1003; *King v. Seaboard Coast Line R.R. Co.* (4th Cir. 1976), 538 F.2d 581, 584.

¶53     Pannoni asserts that the School refuses to consider him for re-employment because of his previous absences caused by his disability. This contention is supported by one sentence in a letter from Werner that Pannoni's employment was officially terminated on May 23, 2000, and that he would "not be eligible for rehire." The School, Werner, and Smyth maintain that this statement by Werner was made without the authority or knowledge

20

of the school board (the only entity with the authority to hire for the School). The School contends that it is not the School's policy to make former employees ineligible for rehire and that previously terminated employees have, in fact, been rehired. Pannoni himself quotes in his brief from a hearing held on April 28, 2002, at which Werner stated "people who were terminated from the district, under unfavorable conditions, would not be reconsidered . . . [but that] wasn't meant to imply, that people could not make a showing of why they should be reconsidered at some point in time." The record reflects that although Pannoni inquired into employment with the School, he never actually applied for a position with the School after his initial termination.

¶54 The Agency decision did not contain any specific findings of fact or conclusions of law regarding Pannoni's "failure to rehire" discrimination claim. Pannoni claims that the Agency erred in failing to make any specific findings of fact and conclusions of law on this issue. The District Court determined that this omission was not error because the findings of fact and conclusions of law made by the Agency clearly determine Pannoni was not entitled to accommodation because he was not a qualified person prior to his termination.

¶55 After reviewing the record, we agree with the District Court that the Agency's failure to enter a specific finding of fact was harmless error. *In the Matter of D.D.*, 277 Mont. at 169, 920 P.2d at 976. The record as a whole supports the conclusion reached by the Agency that Pannoni was not entitled to the protections of the MHRA. *In the Matter of D.D.*, 277 Mont. at 169, 920 P.2d at 976. The Agency determined that Pannoni was not a qualified individual with a disability at the time of his employment termination. *Nowak*, 142 F.3d at

21

1003. Since Pannoni did not apply for re-employment, there was no refusal of re-employment which would have constituted a separate and distinct discriminatory act. *Collins*, 514 F.2d at 596-97. The District Court did not err in affirming the Agency decision because the Agency's findings of fact are not clearly erroneous and the law was correctly interpreted. *Laudert*, ¶ 14. We affirm.

¶56 Issue 4: Whether the District Court erred in denying Pannoni's request to present additional evidence?

¶57 "Our standard of review of a district court's evidentiary rulings is abuse of discretion." *VonLutzow v. Leppek*, 2003 MT 214, ¶ 14, 317 Mont. 109, ¶ 14, 75 P.3d 782, ¶ 14. We determine if "the trial court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." *VonLutzow*, ¶ 14. Additional evidence is admissible "[i]f, before the date set for hearing, [1] application is made to the court for leave to present additional evidence and [2] it is shown to the satisfaction of the court that the additional evidence is *material* and [3] that there were *good reasons* for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon conditions determined by the court." Section 2-4-703, MCA (emphasis added). The agency may then modify its findings and decision based on the additional evidence and file the modifications or new findings with the reviewing court. Section 2-4-703, MCA. Good reason does not include the reports of new experts sought out after the hearing in an attempt to bolster a claim. *Allen v. Sec. of Health and Human Servs.* (9th Cir. 1984), 726 F.2d 1470, 1473.

22

¶58 Pannoni asked the District Court to allow him, pursuant to § 2-4-703, MCA, to present additional evidence to the Human Rights Bureau, the Agency, and the Commission. The additional evidence consisted of (1) the results of a psychological consultation (prepared in June of 2002) which took place more than one year after the initial Agency hearing and (2) a letter from July of 2002 by the School's counsel discussing what Pannoni must do to be rehired. Pannoni states the "good reason" that the evidence was not presented in the initial hearing is that the evidence did not exist at that time.

¶59 The court denied Pannoni's request to present the additional evidence. Regarding the psychological consultation evidence, the court explained that although the evidence may have been relevant, Pannoni failed to provide good reason for his failure to present the evidence in the original proceeding, as required by § 2-4-703, MCA. The fact that the evidence did not exist at the time of trial was Pannoni's choice because he did not obtain the psychological consultation before the Agency hearing. The District Court determined that Pannoni made a tactical decision at the administrative level to rely on hearsay evidence inadmissible under Rules 803(4) and 803(6), M.R.Evid. At the hearing, Pannoni attempted to admit a written report from his medical expert because the expert was not available for the Agency hearing. Pannoni failed to obtain a second expert witness or request a continuance of the hearing. The court concluded this tactical decision does not provide good reason for Pannoni's failure to present non-hearsay evidence at the hearing.

¶60 Although evidence of the consultation may have been relevant, Pannoni did not establish "good reason" why the evidence was not initially presented at the Agency hearing.

23

Section 2-4-703, MCA. Good cause does not include the reports of new experts sought out after the hearing. *Allen*, 726 F.2d at 1473. The discovery of the evidence was not out of Pannoni's control, as occurs with the discovery of a new witness not known about until after a hearing has concluded. *Zanca v. Exhibition Contractors Co.* (La. App. 1993), 614 So.2d 325, 331.

¶61 Additionally, Pannoni has not shown that the letter from the School's counsel is relevant to the issues presented (i.e. the evidence does not have any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence). Rule 401, M.R.Evid. Because the letter was written in July of 2002 (approximately two years after Pannoni's employment was terminated), it could only possibly be relevant to his failure to rehire claim. As explained above, because Pannoni has not reapplied with the School for employment, his failure to rehire claim does not present an independent cause of action. Accordingly, the letter is irrelevant to the issues before the Court. Section 2-4-703, MCA.

¶62 The District Court's analysis of the additional evidence was accurate. The court did not incorrectly interpret or apply the law when it denied Pannoni's motion to present the additional evidence. *VonLutzow*, ¶ 14. We affirm.

¶63 Issue 5: Whether the District Court erred when if did not award costs to the School, Smyth, and Werner?

¶64 The School, Smyth, and Werner claim that the court erred when it denied costs because the Montana Rules of Civil Procedure authorize the recovery of costs, and these

Rules apply to Agency proceedings. These parties claim that the recovery of costs after an offer of judgment is authorized by Rule 68, M.R.Civ.P., applicable to human rights complaints pursuant to § 49-2-505(3), MCA. They also contend that § 25-10-501, MCA, authorizes the recovery of costs.

¶65 The School made an Offer of Judgment on January 31, 2001, in the amount of $7,500 for settlement of the case. Pannoni did not accept this offer. The School claimed that because Pannoni did not obtain a judgment more favorable than the offer made, he should be liable for their costs, pursuant to Rule 68, M.R.Civ.P. The School filed a bill of costs after the Commission affirmed the Agency decision. Pannoni opposed the award of costs on several grounds. The Agency denied the recovery of costs. The Agency stated that the general legislative mandate to follow the Montana Rules of Civil Procedure does not empower the Agency to award costs in contested case hearings. After the District Court upheld the Commission decision affirming the Agency decision, the School, Smyth, and Werner again filed for costs. The costs were denied. The court determined that recovery of costs is only allowed by specific grant of statutory authority. *Jones v. Great Northern Railway Co.* (1923), 68 Mont. 231, 241, 217 P. 673, 677. The court reasoned that because judicial review by a district court of an agency decision is a "special proceeding," a party who prevails may recover costs incurred. However, the court then noted that the costs at issue were not incurred in the special proceeding before the District Court. Instead, the court determined that the costs claimed were incurred in the administrative Agency proceeding. The court concluded no statutory authority permitted recovery of costs incurred at the

25

administrative level. The court stated that, pursuant to § 49-2-505(3)(a), MCA, the Montana Rules of Civil Procedure only apply in Agency hearings to the extent the Rules are adopted by the department (in this case, the Agency). Rule 68, M.R.Civ.P., which allows the recovery of costs after an offer of judgment, has not been adopted by the Agency to apply in Agency-conducted administrative hearings. Lacking authority to award costs incurred only at the administrative hearing level, the court denied the bill of costs in its entirety.

¶66 On appeal, Pannoni argues that the School's, Smyth's, and Werner's cross-appeal as to the denial of costs was not timely filed. He claims the cross-appeal was required to be filed within fourteen days from the filing of a notice of appeal, pursuant to Rule 5(a)(3), M.R.App.P. Pannoni filed his notice of appeal on August 27, 2003. The cross-appeal was filed on October 21, 2003.

¶67 Pannoni neglects to acknowledge the remainder of the code section he cites. In full, Rule 5(a)(3), M.R.App.P., states: "If a timely notice of appeal is filed by a party, any other party may file a notice of appeal within 14 days after the date on which the first notice of appeal was filed, *or within the time otherwise prescribed by this Rule 5(a), whichever period last expires*." (Emphasis added.)

¶68 The District Court order denying the request for costs was entered October 10, 2003. The filing of the cross-appeal on October 21, 2003, falls within the time-limit proscribed by Rule 5(a), M.R.App.P. Rule 5(a), M.R.App.P., requires a "notice of appeal required by Rule 4 shall be filed with the clerk of the district court within 30 days from the date of the entry

26

of the judgment or order appealed from[.]" The cross-appeal was filed within 30 days from entry of the order appealed from. The cross-appeal was thus timely filed.

¶69   The court interpreted the applicable statutes and determined that no statutory basis existed to award costs. The court's interpretation of the law is correct. By the plain language of the statute that makes the Montana Rules of Civil Procedure applicable in an Agency hearing, the Rules are only applicable so far as they are adopted by the Agency. Section 49-2-505(3)(a), MCA. The School, Smyth, and Werner have failed to provide any specific statutory authority authorizing costs in an Agency hearing. No authority has been cited indicating that the Agency adopted Rule 68, M.R.Civ.P., in the context of an administrative hearing regarding employment discrimination. Absent such authority, an award of costs is not proper. *Jones*, 68 Mont. at 241, 217 P. at 677. The District Court's interpretation of the law was correct; it did not abuse its discretion. *Montana Fair Housing, Inc. v. Barnes*, 2002 MT 353, ¶ 12, 313 Mont. 409, ¶ 12, 61 P.3d 170, ¶ 12. We affirm the denial of costs.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ JIM RICE

Justice Patricia O. Cotter concurring and dissenting.

¶70 I concur in the Court's disposition of Issues Two through Five, but dissent from the Court's resolution of Issue One.

¶71 The Court concludes that Pannoni had the burden of proving that he was capable of performing the essential job function of teaching, with or without reasonable accommodation, and that he had failed to prove the premise. ¶¶ 31-33. I believe that the agency, the district court, and this Court misinterpreted and then applied the wrong legal standard of proof, and that had the correct legal standard been applied, additional and important considerations would have come into play, perhaps resulting in a different outcome.

¶72 In *Humphrey v. Memorial Hospital's Association*, the Ninth Circuit held that if a reasonable accommodation is available to an employer which might "plausibly" enable a handicapped employee to adequately perform his job, an employer may be liable for failing to attempt it. *Humphrey*, 239 F.3d at 1135-36. The court further held that a leave of absence for medical treatment may be a reasonable accommodation under the ADA. *Id.* This "plausibility standard," embraced in several state and federal decisions, was subsequently adopted by the United States Supreme Court in the case of *U.S. Airways, Inc. v. Barnett* (2002), 535 U.S. 391, 122 S.Ct. 1516.

¶73 Had the "plausibility" standard been applied, Pannoni would have been required to show that it was plausible to believe that the six-week extension of his unpaid leave of absence (through the end of the May 2000 school year) which he sought, would have allowed him to perform the essential functions of his job beginning the following school year. Rather than apply this standard, however, the hearing examiner essentially required

28

Pannoni to prove that it was more likely than not that the requested accommodation would have been successful, in order for it to be demonstrated as reasonable. The difference is more than semantic. As the Second Circuit put it in *Borkowski v. Valley Cent. Sch. Dist.* (2d Cir. 1995), 63 F.3d 131,138:

> As to the requirement that an accommodation be reasonable, we have held that the plaintiff bears only a burden of production. This burden, we have said, is not a heavy one. It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits. Once the plaintiff has done this, she has made out a *prima facie* showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant.

(Internal citations omitted.)

¶74    The agency and the Court have, in my judgment, imposed too heavy a burden on Pannoni. The Court states that he had to demonstrate that with an extended leave, he could perform the essential job functions. ¶ 35. In other words, he had to prove--on the front end--that the six-week leave he requested would enable him to teach unimpaired in the fall. Under the facts of this case, such a burden was virtually impossible to carry. Had the "plausibility standard" been applied, with the obligation shifting to the school district to show that the leave would have imposed an undue hardship, the burden would at least have been shared by both parties. This more balanced approach to the reasonable accommodation question is what was intended by the *Borkowski, Kimbro,* and *Humphrey* courts, and adopted by the United States Supreme Court in *U.S. Airways v. Barnett.* I believe we have erred in not applying it here.

¶75    I would remand for a decision from the agency in accordance with the "plausibility standard" adopted by the Ninth Circuit and the Unites States Supreme Court. In this

connection, the question before the agency would be whether Pannoni had demonstrated that it was plausible to believe that a six week extension of his unpaid leave of absence would have allowed him to perform the essential functions of his job beginning the following school year. Presuming he could do so, the burden would then shift to the employer to demonstrate that extending the leave of absence for an additional six weeks, through the end of the May 2000 school year, would have imposed an undue hardship on school operations. I dissent from our refusal to do so.

/S/ PATRICIA O. COTTER

Justice Jim Regnier joins in the concurrence and dissent of Justice Patricia O. Cotter.

/S/ JIM REGNIER